UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE CHATFIELD, TRINA CHATFIELD
LAWRENCE N. CHATFIELD, BRIANA
CHATFIELD, and LAUREN CHATFIELD,

        Plaintiffs,

vs.

GROSSE POINTE PUBLIC SCHOOL SYSTEM,
CITY OF GROSSE POINTE PARK, CITY OF
GROSSE POINTE FARMS, and MICHAEL
McCARTHY,

        Defendants.
_____/

Civil Action No.
10-cv-13861

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER
(1) GRANTING DEFENDANT MICHAEL McCARTHY'S MOTION TO DISMISS
AND/OR FOR SUMMARY JUDGMENT (Dkt. No. 97),
(2) GRANTING DEFENDANT CITY OF GROSSE POINTE FARMS' MOTION FOR
SUMMARY JUDGMENT (Dkt. No. 99),
(3) GRANTING DEFENDANT CITY OF GROSSE POINTE PARK'S MOTION TO
DISMISS AND FOR SUMMARY JUDGMENT (Dkt. No. 102),
(4) GRANTING DEFENDANT GROSSE POINTE PUBLIC SCHOOL SYSTEM'S
MOTION FOR SUMMARY JUDGMENT (Dkt. No. 105),
(5) DENYING PLAINTIFFS' MOTION REQUESTING JUDICIAL NOTICE (Dkt. No.
110)**

This is a civil rights case. Lawrence Chatfield and Trina Chatfield, along with their minor children, Lawrence N. Chatfield, Briana Chatfield, and Lauren Chatfield (collectively "Plaintiffs"), allege that the Grosse Pointe Public School System, City of Grosse Point Park, City of Grosse Pointe Farms, and Michael McCarthy (collectively "Defendants") targeted them for surveillance and excluded the children from school based on their race.

1

On September 27, 2010, Defendants removed the action from Wayne County Circuit Court to this United States District Court. (Dkt. No. 1.) Defendant McCarthy filed a Motion to Dismiss and/or for Summary Judgment on January 12, 2012. (Dkt. No. 97.) Defendant City of Grosse Pointe Farms filed a Motion for Summary Judgment on January 13, 2012. (Dkt. No. 99.) Defendants City of Grosse Pointe Park and Grosse Pointe Public School System filed separate Motions to Dismiss and/or for Summary Judgment on January 17, 2012. (Dkt. Nos. 102, 105.)

On February 17, 2012, Plaintiffs filed one Response to all four of Defendants' motions. (Dkt. No. 109.) Plaintiffs also filed a Motion Requesting Judicial Notice Be Taken of the Professional Investigator Licensure Act, M.C.L. §§ 338.821, 822.22, 338.823 and 338.824. (Dkt. No. 110.) On March 5, 2012, Defendants City of Grosse Pointe Farms, City of Grosse Pointe Park, and McCarthy, all filed separate Replies. (Dkt. Nos. 111, 112, and 113.) Defendant Grosse Pointe Public School System filed a Reply on March 9, 2012. (Dkt. No. 114.) The Court held a hearing on April 12, 2012.

For the reasons set forth below, the Court will GRANT Defendants' motions and Dismiss this action.

## I. BACKGROUND

Plaintiff Chatfields are African-American citizens. The Chatfield children were first enrolled in the Grosse Pointe Public School System ("GPPSS") in September 2006. As part of the GPPSS enrollment process, Plaintiff Trina Chatfield filled out a Residency Affidavit, which listed Plaintiffs' residence as 950 Beaconsfield in Grosse Pointe Park, Michigan. (Def. GPPSS' Mot. for Summ. J. Ex. C, Residency Aff.) The Residency Affidavit further provided as follows: "I further understand that GPPSS may conduct an investigation and/or use whatever legal means it has at its disposal to verify the information provided in this affidavit." (*Id.*)

In the spring of 2008, a GPPSS student admitted to a teacher that he was a member of the Bloods street gang. Concerned about the potential for increased gang affiliation, GPPSS contacted Defendant Grosse Pointe Park's ("GPP") Department of Public Safety. One of the methods aimed at thwarting potential gang activity involved GPP Department of Public Safety officers contacting the parents of students who were suspected of being gang members, or who were associated with suspected gang members, and encouraging the parents to take steps to address the issue within the home. GPPSS Assistant Principal Judith Gaffrey identified Plaintiff Briana Chatfield as an associate of a potential gang member. (Def. GPP's Mot. Summ. J. Ex. 8, GPP Department of Public Safety Information Sheet.)[1]

GPP Department of Public Safety Officer James Vogler attempted to contact Plaintiffs at their home several times. (Def. GPP's Mot. Summ. J. Ex. 6, Vogler Dep. 12.) Officer Vogler testified that he went to the home at 950 Beaconsfield "early, in the middle of the day and in the evening[,]" and never made contact with any of the Plaintiffs.[2] (Vogler Dep. 26.) Officer Vogler concluded that the 950 Beaconsfield address was possibly vacant. (Def. GPP's Mot. Summ. J. Ex. 9, Vogler Email.)[3] The GPP Department of Public Safety subsequently reported this information to Assistant Principal Gaffrey. (Def. GPP's Mot. Summ. J. Ex. 3, Gaffrey Dep. 76.)

On March 17, 2008, Gaffrey emailed Susan Vogel in the Office of Residency and Enrollment for GPPSS, requesting a residency check for the 950 Beaconsfield property. (Def. GPPSS' Mot. Summ. J. Ex. G, Mar. 17, 2008 Email.) Vogel then contacted Trudy Maples, another Office of Residency employee, on March 18, 2008, regarding Gaffrey's request for a

---

[1]Defendant GPP filed this exhibit under seal. (Dkt. No. 103.)

[2]The residence was in the second floor of a duplex.

[3]This exhibit was filed under seal. (Dkt. No. 104.)

3

residency check. Maples emailed Defendant McCarthy, who regularly conducted residency investigations for Defendant GPPSS at that time. (GPPSS' Mot. Summ. J. Ex. J, Mar. 18, 2008 Email.) At no point did Gaffrey, Vogel, or Maples mention in their correspondence that the Chatfields are African-American.

The Assistant Superintendent for Business and Support Services at GPPSS, Christian Fenton, supervised both Sue Vogel and Trudy Maples. (Def. Grosse Pointe Farm's Mot. Summ. J. Ex. D, Fenton Dep. 5-6.) It was Fenton's decision to investigate families suspected of committing residency violations, and he made the decision to investigate Plaintiffs' residency in March 2008. (*Id.* at 8.)

Defendant McCarthy was employed by Defendant City of Grosse Pointe Farms ("GPF"). The GPF Department of Public Safety provided Defendant McCarthy with a service handgun and a taser, and permitted him to use two Ford Crown Victoria vehicles, one black and one gold, which were unmarked. Defendant McCarthy's employment as a residency and census investigator with GPPSS was separate from his employment with GPF. However, Defendant McCarthy carried the service weapon and taser provided by Defendant GPF in the course of his residency investigations.

Defendant McCarthy made two unannounced visits to the 950 Beaconsfield address, first on the evening of April 3, 2008, and again on the evening of April 15, 2008. (Def. GPF's Mot. Summ. J. Ex. H, McCarthy Report 1.) On both occasions, Defendant McCarthy knocked on the front door, but received no answer. (*Id.*) Defendant McCarthy also spoke with the landlord for 950 Beaconsfield on April 15, who stated that the Chatfield family was currently renting the unit. (*Id.*)

4

Also on April 15, Defendant McCarthy called Plaintiff Lawrence Chatfield and left a voicemail. Mr. Chatfield returned McCarthy's phone call later that evening and stated that his family lived at the 950 Beaconsfield address, but declined to meet with McCarthy at that time. (Def. GPF's Mot. Summ. J. Ex. I, Lawrence Chatfield Dep. 41-42.)

On the evening of April 23, 2008, Defendant McCarthy made an unannounced visit to a home located at 18639 Teppert Street in Detroit, Michigan, which was listed in school records as a previous address for Plaintiffs. Defendant McCarthy saw Mr. and Mrs. Chatfield exiting the house and approached them. (McCarthy Report 1.) Defendant McCarthy identified himself and gave Plaintiffs his card. Mr. Chatfield stated that the house at 18639 Teppert Street belonged to his grandmother, who had recently passed away, and that he was cleaning it. (*Id.*)

The next day, April 24, 2008, Defendant McCarthy arrived at the 18639 Teppert Street house at 6:37 a.m. and observed that the same three cars that were parked in the driveway on the previous day were still in the driveway. (*Id.* at 2.) At 7:55 a.m., Defendant McCarthy knocked on the door and called the home, but received no answer. (*Id.*) At 8:10 a.m., Defendant McCarthy called Pierce Middle School, where two of the Chatfield children were enrolled, and learned that one of the Chatfield parents had called to tell the school that the children would not be attending that day. (*Id.*)

On April 28, 2008, Defendant McCarthy returned to the 18639 Teppert Street house at 6:47 a.m., and again found the same three cars parked in the driveway. (McCarthy Report 2.) At 8:12 a.m., Mr. Chatfield exited the home. (Lawrence Chatfield Dep. 289.) Defendant McCarthy approached Mr. Chatfield and asked if the Chatfield children were in the home. Mr. Chatfield admitted that his children were at the 18639 Teppert Street house at that time. (*Id.* at 290.)

Defendant McCarthy also asked Mr. Chatfield why the phone at the 950 Beaconsfield address was disconnected. Mr. Chatfield said that he did not know. (*Id.*)

Defendant McCarthy also checked the 18639 Teppert Street address in a Bresser's Index at the GPF Department of Public Safety offices, which reflected that the home was registered to both Mr. and Mrs. Chatfield. (Def. GPF's Mot. Summ. J. Ex. A, McCarthy Dep. 23-24.)

Defendant McCarthy ultimately summarized and concluded his investigation as follows in a report to Trudy Maples:

> It appears that the Chatfield's are renting an address in Grosse Pointe Park, but residing in the City of Detroit.
>
> During two evening visits at 950 Beaconsfield, I did not observe anyone at the home. On both visits (evening and early morning) at 18639 Teppert St, I met with Mr. Chatfield. On a third unannounced visit at 18639 Teppert St, it appears they were home (all three cars were parked in the driveway), but did not answer the door.
>
> School records also indicate that the Teppert home was listed as a previous address, and the current 2008-2009 Bresser's Cross Index Directory lists Lawrence and Trina Chatfield at 18639 Teppert St, Detroit.

(McCarthy Report 2-3.)

Defendant McCarthy testified that he investigated white families and African-American families for Defendant GPPSS. (McCarthy Dep. 36.) Plaintiffs do not contend that Defendant McCarthy made any comments referring to their status as African Americans, and admit that they have no evidence that he was investigating them on the basis of their race. (Lawrence Chatfield Dep. 269.)

After Defendant McCarthy submitted his investigation report, Assistant Superintendent Fenton made the decision to exclude the Chatfield children from GPPSS. (Fenton Dep. 21.) In a letter dated May 7, 2008, Plaintiffs were notified that Defendant GPPSS believed they were not

6

residing in the school district, and that the Chatfield children were therefore no longer eligible to attend GPPSS schools. (Def. GPF's Mot. Summ. J. Ex. L, May 7, 2008 Letter.) The letter further provided: "As a consequence, they shall be excluded from school at the end of the day Friday, May 9, 2009. If you wish to present documentation that they are eligible to remain in school in the district you may contact my office . . . to make an appointment for a meeting to do so." (*Id.*) The letter also provided a telephone number for Assistant Superintendent Fenton.

The Chatfields disagree about whether they received the letter on May 7 or May 8. (Lawrence Chatfield Dep. 201; Def. GPF's Mot. Summ. J. Ex. K, Trina Chatfield Dep. 57.) However, the Chatfields agree that on the morning of May 8, 2008, they received calls from two teachers with GPPSS, who were asked to give the letter to the Chatfield children: a Mr. Frakes, and a Mr. Buslepp. (Lawrence Chatfield Dep. 201; Trina Chatfield Dep. 58.) These teachers called the Chatfields to encourage them to address the residency issue with GPPSS administration.

> Q  So as you understood your husband's conversation with Mr. Buslepp, it sounds like Mr. Buslepp was telling your husband the same thing Mr. Frakes was telling you?
> A  Correct.
> Q  Go down to the Board office. Take your stuff and get it squared away?
> A  Correct.
> Q  Because we don't want to give these letters to the kids?
> A  Correct.

(Trina Chatfield Dep. 61.)

On the afternoon of May 8, 2008, Mr. Chatfield went to the GPPSS Central Office with a landlord affidavit and some utility bills for the 950 Beaconsfield address. (Lawrence Chatfield Dep. 202-03.) When he arrived at the Central Office, Mr. Chatfield attempted to hand his

7

paperwork over to an officer worker named Mary Fritz, but she declined to accept his residency materials, and instead attempted to contact an individual in the residency office. (*Id.* at 204.)

| | |
|---|---|
| Q | So did it appear to you that Ms. Fritz was trying to get ahold of somebody who could address this situation, who could help with the situation? |
| A | Yes, it did. |
| Q | You said one of the people it sounded like she was calling was the residency office and she said that the residency office person who takes the papers is on the phone at the moment? |
| A | Yes. |
| Q | Did she ask you to wait? |
| A | No. She didn't ask me to wait. |
| Q | Did she tell you to come back another time? |
| A | She told me that I could come back tomorrow. |

(*Id.* at 205.)

Mr. Chatfield also asked Ms. Fritz if he could make copies of his paperwork, so that he could leave it for the residency office, but Ms. Fritz said she could not assist him with making any copies. (*Id.* at 209.)

After the denial to assist him with making copies, Mr. Chatfield testified that he "was put off at that point so I left." (*Id.*) Mr. Chatfield went to a bank and then returned to the Central Office about 15 minutes later. (*Id.*) Upon entering the building, Mr. Chatfield saw Ms. Fritz in the hallway. Ms. Fritz told Mr. Chatfield that Sue Vogel in the residency office was still on the phone. At that point, Mr. Chatfield returned home.

| | |
|---|---|
| Q | So when you encountered Ms. Fritz on your return trip to Central Office and you said you ran into her in the hallway, was this in the hallway outside the office where you had interacted with her previously? |
| A | No. Actually just entering the door. |
| Q | So she was near the main entrance and exit to the building when you encounter [sic] her in the hallway? |
| A | Yes. In that area. |
| Q | Did it look like she was leaving for the day? Did she have her coat? |

8

> A No. I couldn't tell. I don't know.
> Q So you didn't actually get any further into the building than that. You actually stopped and talked to her there and when she said: Sue is still on the phone and you turned around and left. Is that fair?
> A Yes.

(Lawrence Chatfield Dep. 210-11.)

Despite Ms. Fritz's suggestion that Mr. Chatfield could return on May 9 with his paperwork, after Mr. Chatfield left the Central Office on May 8, 2008, the Chatfields did not make any return trips to the Central Office before their children were excluded. Mr. Chatfield testified that, after Ms. Fritz refused to assist him, he "most certainly wasn't going to go around and beg anyone." (*Id.* at 214.)

Mr. Chatfield testified that he and his wife did attempt to call the school board at a later date, but he could not recall if it was on May 8 or 9 or a later date, and he could not recall if they ever called the number for Assistant Superintendent Fenton's office listed on the May 7 letter. (*Id.* at 216.) Mrs. Chatfield testified that, after Mr. Chatfield's attempts on May 8, they did not make any further attempts to contact GPPSS at all, either by phone or in person or otherwise, before their children were excluded on May 9.

> Q So we're in the evening on May 8, 2008. You have got the letter. Now your husband has relayed to you his efforts in going down to the Board office on May 8th in the afternoon. Did you call anybody else the evening of May 8th from the school system?
> A No.
> Q What about May 9th. Did you make any efforts on May 9th, which would have been Friday, the day the students were apparently going to be, their last day of school but they were going to be ineligible thereafter. Did you personally undertake any effort on May 9th to try to iron out the situation; get it remedied?
> A They already had refused our information so we didn't see a reason to try to go back to present the same information they refused to take on the day before.

9

> Q   Well, had your husband relayed to you that during his trip to the Board office on May 8th, 2008, that they said you can come back another day. You can come back tomorrow to try to present the documentation to the person who actually needs to see it. Did he relay that to you?
> A   I'm not sure if he relayed those exact words to me but it was my understanding that they were going to be removed from school on the 9th. So why wouldn't they take the information on the 8th? Are we supposed to go begging and bleeding.

(Trina Chatfield Dep. 70-71.)

After the Chatfield children had been excluded from school for a week and a half, Mrs. Chatfield received a call from Christine Kramer, who was Briana and Lawrence N. Chatfield's counselor at GPPSS. Ms. Kramer informed Mrs. Chatfield that the children could finish the school year if the Chatfield's paid tuition. (*Id.* at 73-74.) In the week and a half between May 9 and the call from Ms. Kramer, the Chatfields had made no attempt to contact Assistant Superintendent Fenton or anyone else at GPPSS regarding their residency status. (*Id.* at 75.)

Mrs. Chatfield was also contacted after May 9 by Briana Chatfield's teacher, Mr. Buslepp. (*Id.* at 80-81.) Mr. Buslepp asked Mrs. Chatfield if Briana was going to attend the National Junior Honor Society trip to Mackinaw, which the Chatfield's had prepaid. However, Mrs. Chatfield had assumed that, because Briana was excluded from school at that time, she would not be permitted to attend the Mackinaw trip, although she had not called anyone at GPPSS to confirm her assumption. (*Id.* at 83.) When Mr. Buslepp informed Mrs. Chatfield that Briana could attend the Mackinaw trip, Mrs. Chatfield said Briana would not attend.

> Q   So when Mr. Buslepp said "She's coming" and you realized that she could in fact go, you said: No, she's not going to be going?
> A   Correct.
> ( . . . . )

10

| | |
|---|---|
| Q | After she was deemed ineligible to attend Grosse Pointe Schools, had you guys had any conversations, you and Briana, about her not being able to go on that trip? |
| A | Yes, unfortunately. |
| Q | So you had -- you said to her: Honey, because you're not going to school there anymore, you're not going on the Mackinaw trip? |
| A | That was our understanding. |
| Q | Was that your assumption or was that your understanding? |
| A | Well, again, I was not aware that children who were not able to attend a particular school could attend that particular school related trips. |
| Q | But you had never had any conversation with anybody at the Grosse Pointe Public School system wherein you were told Briana could not go on the Mackinaw trip, correct? |
| A | Correct. |

(Trina Chatfield Dep. 82-83.) Mrs. Chatfield admits that she never requested reimbursement for the prepaid amount of Briana's Mackinaw trip. (*Id.* at 83-84.)

On May 28, 2008, the Chatfield's paid $507 in tuition to GPPSS, and the Chatfield children were readmitted for the remainder of the school year. In the summer of 2008, after submitting their residency materials to GPPSS, the Chatfield children were allowed to enroll in classes at GPPSS without tuition. The Chatfields maintain that they consistently resided at 950 Beaconsfield throughout 2008, but have never requested reimbursement of the $507 they paid in tuition for that year. (Trina Chatfield Dep. 84.)

## II. STANDARD OF REVIEW

Defendants have moved for dismissal under both Federal Rule of Civil Procedure 12(b)(6) and 56(c).

### A. Motion to Dismiss

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept

11

its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). However, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must establish a plausible right to relief. *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original).

### B. Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" Fed. R. Civ. P. 56(c). The Court must, however, view the evidence and draw all reasonable inferences in favor of the party opposing summary judgment. *Matsushita Electric Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 547, 587 (1986). Still, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). The test is whether a rational trier of fact could, based on the evidence presented as a whole, find in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

### III. ANALYSIS

Plaintiffs' Complaint alleges the following causes of action arising out of the investigation of Plaintiffs and eventual exclusion of the Chatfield children from GPPSS: (1) Deprivation of Civil Rights pursuant to 42 U.S.C. § 1983; (2) Racial discrimination in violation

of 20 U.S.C. § 1703; (3) Lack of due process; (4) Violation of Mich. Const. art. 1, § 17; (5) Lack of equal protection; (6) Libel and slander; (7) Violation of Michigan School Funding Law; (8) Wrongful and improper combination; and (9) Deliberate indifference.

As an initial matter, the Court notes that Plaintiffs admit their allegations of libel and slander in Count Six are barred by the statute of limitations. (Pls.' Resp. Br. 13.) Accordingly, the Court will dismiss those claims.

Plaintiffs have failed to produce any evidence showing that Defendants violated Plaintiffs' constitutional rights, or that Defendants were unlawful in investigating Plaintiffs and excluding their children from school. Plaintiffs' claims will therefore be dismissed. Furthermore, because Plaintiffs have failed to show that Defendant McCarthy's licensure as a private investigator is material, as discussed *infra*, Plaintiff's Motion Requesting Judicial Notice Be Taken of the Professional Investigator Licensure Act will be denied.

## A. Defendant McCarthy

Plaintiffs allege that Defendant McCarthy deprived them of their right to equal protection in violation of 42 U.S.C. § 1983 by performing surveillance of their activities at the 18639 Teppert Street address, and by concluding that Plaintiffs did not reside in the GPPSS district, thereby causing Defendant GPPSS to exclude the Chatfield children from school based on lack of residency. Plaintiffs claim that Defendant McCarthy took the above actions against Plaintiffs on the basis of their race and ethnicity.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Heyne v. Met.*

13

*Nashville Public Schools*, 655 F.3d 556, 562 (6th Cir. 2011) (citing *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007)).

The evidence in the record shows that Defendant McCarthy observed the outside of the 18639 Teppert Street home, including the type of cars that were in the driveway, and on two occasions observed when Mr. Chatfield was exiting the home, including one occasion when he exited the home with Mrs. Chatfield. In addition, Defendant McCarthy observed the outside of the 950 Beaconsfield address.

Defendant McCarthy's observation of Plaintiffs' activities outside of these buildings does not violate Plaintiffs' constitutional rights. Observations occurring in the "open fields" do not constitute a Fourth Amendment search. *See Widgren v. Maple Grove Tp.*, 429 F.3d 575, 579-80 (6th Cir. 2005) (holding that no Fourth Amendment search occurred where township zoning administrator advanced up the plaintiffs' driveway, past a metal gate and a "No Trespassing" sign, and observed the exterior of the plaintiffs' house). Accordingly, Defendant McCarthy's observations of Plaintiffs' public activities did not violate any of the Plaintiffs' constitutional rights.

The evidence also shows that Defendant McCarthy searched a Bresser's Index and discovered that the 18639 Teppert Street address was registered to Mr. and Mrs. Chatfield. Plaintiffs have no reasonable expectation of privacy in publicly available information, including registration information disclosed in public documents. *See Does v. Munoz*, 507 F.3d 961, 965 (6th Cir. 2007) (holding that convicted sex offenders had no right to privacy in their public convictions). Defendant McCarthy's use of the Bresser's Index in the course of his investigation thus did not violate any of the Plaintiffs' constitutional rights.

After his investigation, Defendant McCarthy concluded "that the Chatfield's are renting an address in Grosse Pointe Park, but residing in the City of Detroit." (McCarthy Report 2.) Based on this conclusion, Assistant Superintendent Fenton decided to exclude the Chatfield children from school due to lack of residency.

Plaintiffs have not produced any evidence tending to show that Defendant McCarthy's conclusion was based on racial animus. Indeed, Plaintiffs admit that they have no evidence that Defendant McCarthy was investigating them based on their race. (Lawrence Chatfield Dep. 269.) Moreover, Defendant McCarthy's investigation, the accuracy of which Plaintiffs do not dispute (Lawrence Chatfield Dep. 269-92), supports his conclusion that Plaintiffs were, at the time his investigation took place, residing in Detroit. Accordingly, Plaintiffs have failed to produce any evidence that Defendant McCarthy violated any of their constitutional rights.

Plaintiffs argue that "McCarthy was not an employee of Grosse Pointe Public Schools but a sub-contractor, acting as a private individual and consequently not entitled to the benefit of governmental immunity." (Pls.' Resp. Br. 11.) However, the United States Supreme Court recently decided that private contractors hired by the government to perform work are entitled to governmental immunity. *See Filarsky v. Delia*, 566 U.S. ___, 132 S.Ct. 1657, 1665 (2012).

Because Plaintiffs have failed to produce evidence that Defendant McCarthy performed any unlawful act, or that he acted with an unlawful purpose, Plaintiffs' civil conspiracy claim must also be dismissed. *See Fenestra Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593 (1966) (defining "conspiracy" as "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means.").

15

The Court also finds that Defendant McCarthy is entitled to summary judgment on Plaintiffs' claims arising under the Michigan Constitution. In addition to Plaintiffs' failure to produce any evidence of a constitutional violation, Plaintiffs are not entitled to any monetary compensation even if they could establish a violation under the Michigan Constitution. *Lewis v. Michigan*, 464 Mich. 781, 789 (2001) ("Given the language of the Michigan Constitution, we hold in this case that we are without proper authority to recognize a cause of action for money damages or other compensatory relief for past violations of [Mich. Const. 1963 art. 1 & 2].").

Plaintiffs have failed to establish a genuine issue of material fact regarding whether Defendant McCarthy acted with any racial animus or unlawful purpose. Accordingly, their claims against him will be dismissed.

**B. Municipal Defendants**

"If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Because Plaintiffs have failed to establish any constitutional violation by Defendant McCarthy, Defendants GPPSS, GPP, and GPF are thus entitled to summary judgment.

The residency policy of Defendant GPPSS does not contain an explicit racial classification. It is therefore Plaintiffs' burden to show that the law "'was motivated by a racial purpose or object,' or 'is unexplainable on grounds other than race.'" *Moore v. Detroit School Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

Plaintiffs have referenced in their brief in response to summary judgment statistical evidence showing that Defendant GPPSS investigated the residency of white students, on average, 23 percent of the time between 2005 and 2010. Plaintiffs have not attached the actual

16

statistical analysis as an exhibit to their brief, but even if the Court were to presume that, on average, African-American families were 77 percent more likely to undergo residency investigations, Defendants are still entitled to summary judgment. "Proving that a law has a racially disparate impact, without more, is . . . insufficient to establish a violation of either the Fourteenth or the Fifteenth Amendment." *Id.* (citing *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977)). Plaintiffs have thus failed to adequately support a § 1983 claim for racial discrimination.

  Plaintiffs have also failed to establish that they were not given sufficient due process. Plaintiffs were given notice, both by letter from Assistant Superintendent Fenton and by personal phone calls from two of the childrens' teachers, of the impending exclusion of the Chatfield children. Defendant GPPSS was not required to provide Plaintiffs with any additional notice or appellate process. *Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 927 (6th Cir. 1988) ("A student faced with expulsion has the right to a pre-expulsion hearing before an impartial trier-of-fact – he does not have the right to a full-blown administrative appellate process."). To the extent that Plaintiffs argue they were stymied by Ms. Fritz when Mr. Chatfield attempted to present his residency paperwork, the Court notes that Plaintiffs refused to return to the GPPSS office on May 9, 2008, despite Ms. Fritz's invitation to do so. Instead, after Mr. Chatfield felt like he was treated rudely on May 8, 2008, Plaintiffs did nothing to prevent the exclusion of their children from GPPSS schools. Plaintiffs did not attempt to re-submit the residency paperwork before May 9, 2008, or in the time between May 9 and their paying tuition for their children to be readmitted. Prior to the end of the school day on May 9, 2008, Plaintiffs also never followed the instructions on the May 7, 2008 letter stating that they could contest the residency finding by

calling Assistant Superintendent Fenton's office. Accordingly, Plaintiffs have failed to establish that they were not accorded sufficient due process.

Plaintiffs have also brought a claim under the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C. § 1703. Under the EEOA, "an educational agency is prohibited from deliberately segregating students on the basis of race or failing to take affirmative steps to eliminate the vestiges of a dual school system." *United States v. School Dist. of City of Ferndale, Mich.*, 616 F.2d 895, 907 (6th Cir. 1980). Because Plaintiffs have failed to produce any evidence of deliberate segregation, or of any racial discrimination, Plaintiffs' EEOA claim will also be dismissed.

Regarding Plaintiffs' claims arising under the Michigan School Funding Law, the Court finds that Plaintiffs have failed to establish that Defendant GPPSS violated the law by charging them tuition. At the time Plaintiffs paid tuition, Defendant GPPSS had investigated Plaintiffs and concluded that they resided outside of the GPPSS district. Having so concluded, Defendant GPPSS was fully authorized under Michigan law to charge tuition for Plaintiffs' children to attend its schools. M.C.L. § 380.1401(1) ("The board of a school district may admit nonresident pupils to the schools of the district. The board shall determine the rates of tuition of the nonresident pupils and shall collect the tuition.").

Furthermore, as noted *supra*, Plaintiffs have failed to show that the municipal Defendants acted with any unlawful intent or purpose. Accordingly, Plaintiffs' civil conspiracy claims against them will be dismissed. *Fenestra Inc.*, 377 Mich. at 593. In addition, the municipal Defendants are immune from Plaintiffs' state-law claims pursuant to Michigan's governmental immunity statute, M.C.L. § 691.1407.

## V. CONCLUSION

For the reasons stated above, the Court will:

(1) **GRANT** Defendant McCarthy's Motion to Dismiss and/or for Summary Judgment;

(2) **GRANT** Defendant City of Grosse Pointe Farms' Motion for Summary Judgment;

(3) **GRANT** Defendant City of Grosse Pointe Park's Motion to Dismiss and for Summary Judgment;

(4) **GRANT** Defendant Grosse Pointe Public School System's Motion for Summary Judgment;

(5) **DENY** Plaintiffs' Motion Requesting Judicial Notice Be Taken of the Professional Investigator Licensure Act, M.C.L. §§ 338.821, 822.22, 338.823 and 338.824; and

(6) **DISMISS** the case **WITH PREJUDICE**.

**SO ORDERED**.

Dated: 5-23-12
Detroit, Michigan

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE